# St. Andrew's Lutheran Church's Appeal.

1. On the sale of a number of contiguous lots, the grantor and grantees covenanted with each other, that each of the lots should be subject to a restriction that none of them should " be used for purposes other than a dwelling-house, office, privy, coach-house or stable, the restriction to cease only when the lot should be built on according to the spirit of the agreement." This was a covenant running with the land and bound the successors of the parties.

2. A court of equity will enforce the specific performance of such covenant by restraining its breach unless some good ground be shown to the contrary.

3. The erection of a church on one of the lots is prohibited by the covenant.

4. The occupancy of a lot adversely to the use secured by the covenant would effectually answer a prayer for equitable interference.

5. Where a party has slept on his rights for a period far less than is necessary to create a bar by the Statute of Limitations, a chancellor will not interfere.

6. One of the lots had been occupied by owners as a coal-yard, with railroad, sheds for coal, scales and stable, for more than twenty-one years. *Held,* that this was not an adverse user.

7. Covenants of this nature restraining a man in the free enjoyment of his property are not to be extended by implication.

February 27th 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court at Nisi Prius : In Equity : No. 3, to July Term 1869.

This was a bill filed, April 22d 1869, by William C. Ludwig against The St. Andrew's Evangelical Lutheran Church of Philadelphia.

The bill set out that, on the 23d of January 1837, David Winebrenner was seised of a square of ground extending from Broad street on the east to Fifteenth street on the west, and from Arch street on the north to Cuthbert street on the south, in Philadelphia, and had divided it into a number of smaller lots; that on the same day they conveyed a number of these lots to divers persons, amongst whom were Isaac S. Lloyd, Robert M. Lewis, Lawrence Lewis and George W. Stricker, in fee. On the same day the grantors and grantees by deed mutually covenanted that all the lots should be subject to the restriction that "no building should be built upon either of the several lots of ground, to be used for purposes other than as and for a private dwelling-house, office, privy or necessary-house, coach-house or stable;" that the lots sold to Lloyd, the Lewises and Stricker were the three easternmost lots, which by divers mesne conveyances became vested in fee in the defendant on the 24th of September 1868. The bill further set out that the plaintiff was the owner of a lot adjoining the three lots on the west, the title to which he derived mediately from Winebrenner and Leland, and that he was entitled to the benefit of the restriction which had been an inducement to him to invest in the property as a dwelling-house, and that it added to the value of his property; that the defendants were about to erect a church building in disregard of notice from the plaintiff; that this erection would be a violation of the plaintiff's right to have no building but a dwelling-house erected on the lots, and would destroy the symmetry of the row of houses which are all bound by the restriction, and would interfere with the plaintiff's enjoyment of light and air; that the erection would be an irreparable injury which could not be compensated by damages.

The prayers were—1. For an injunction restraining the defendants from erecting or proceeding with the erection of said church.

2. For an injunction restraining the defendants from erecting any building whatever in violation of the restriction contained in the agreement of January 23d 1837.

3. Further relief.

The answer denied that anything had been done or contemplated which would abridge the value or diminish the comfort, or

17 P. F. SMITH—33

impair the enjoyment of plaintiff's premises. It admitted the purpose to erect a church edifice upon the lots, but denied that it would violate the spirit, true intent and meaning of the restriction, or that the restriction operated upon the premises. It averred that the "three lots, since the autumn of 1842, and up to the taking possession thereof by the church corporation, about April 1st 1869, were used and occupied as a coal-yard. That all the requisite improvements for the business were erected as early as 1842. That the use of the premises in this way was notorious and continued, with the full knowledge of the owners under whom the plaintiff derives title, and without any steps taken to prevent the same. That in 1842 a brick counting-house was erected on the corner of Arch and Broad streets, and used continuously until 1860 in the coal business. That in January 1843 a six-ton platform-scale was erected upon said lot, and a few months afterwards a railroad track, extending from the track on Broad street, was laid upon said lot for the carriage of coal into the yard, and all the requisite shedding for storing coal was erected on said premises, and that early in 1848 a brick stable two stories high was erected upon the rear of said premises, to be used in connection with the coal business. That in February 1848 Davis Pearson and Gideon Bast, who had occupied the premises from 1842 for the coal business, purchased the westernmost of the said three lots, and thereafter continued the business for a time, and then Pearson continued the same individually until within four or five years past, when he was succeeded by Daniel Rothermel, who there continued the business until early in 1869. That according to the plan upon which it is proposed to build the said church edifice, an open passage-way about five feet wide will be left between the said edifice and the plaintiff's house, and that the back buildings of the plaintiff's house face westwardly, and thus present a continuous dead-wall along the dividing line between his lot and that of the corporation defendants. They submit and insist that by reason of this open, continued, visible and notorious use of the said three lots in a manner wholly inconsistent with and adverse to the alleged restriction, without any assertion of said restriction by those who claim its alleged benefits, all right to assert it or enforce it is wholly barred and defeated; and that the true intent, spirit and meaning of the said restriction is the prevention of nuisances by the exclusion of structures which would injuriously affect the value or the enjoyment of the dwelling-houses erected upon said square, and that the church edifice will in no way impair the enjoyment, and will in some degree add to the value of the said dwelling-houses; and they deny that the said church edifice will inflict an irreparable injury upon the plaintiff, or any injury whatever, and they say that if he suffers any injury he has an adequate remedy at law."

[St. Andrew's Church's Appeal.]

The deed in which were the covenants for the restriction, further covenanted: "That each and all of their respective lots of ground on the south side of said Arch street, &c., shall be subject to and charged with the above-mentioned restriction and agreement as to the buildings to be erected upon their several lots of ground, &c.; and that for the enforcement of the said agreement and restriction, and to enable the parties fulfilling and complying with the agreements to obtain immediate redress upon any infringement thereof without delay and unnecessary expense, that in case of any infringements of the covenants herein contained by the erection of any building or buildings upon either of their several lots of ground to be used for other purposes than as a private dwelling-house, office, privy or necessary-house, coach-house or stable, &c., it shall and may be lawful to and for the parties who shall have complied with the said agreement, their heirs and assigns, and full power and authority is hereby given them either personally or by their agents or workmen for that purpose appointed and employed, to enter and proceed upon the lots or lot upon which such building contrary to the agreement herein contained shall be erecting or erected, building or built, and the said building or parts of a building at once to tear or pull down and remove, and so as often as the same may be rebuilt; and that the party or parties infringing upon the provision of the agreement aforesaid shall not claim nor receive, nor be entitled to any damages or expenses, nor right of action of trespass or otherwise therefor: Provided always nevertheless, and it is hereby expressly covenanted, understood and agreed by and between the said parties to this agreement, that whenever either of the said lots of ground shall be improved by buildings as herein above-mentioned, and which shall be built in accordance with the spirit of this agreement, then and from thenceforth the said restrictions herein stipulated and expressed shall, so far as the lot or lots of ground so improved are concerned, be deemed and considered as of no further force and effect, yet so that the said restrictions shall still be binding and obligatory upon the lot or lots of ground that may from time to time be improved or built on contrary to the spirit and true intent and meaning of this agreement," &c.

A replication was filed, and Samuel Robb, Esq., was appointed examiner and master. By his report he found the title of the parties, and the purpose to erect a church building, as set out in the bill and answer; also the deed containing the restriction, &c. He further reported:—

"The three lots owned by the church defendants were used continuously, from 1842 to March 1869, as a coal-yard: first by Davis Pearson and Gideon Bast, then by Davis Pearson individually, then by one Baum, then by Daniel Rothermel & Brother, and finally by Daniel Rothermel alone.

" In 1842 Messrs. Pearson & Bast, then lessees of the said three lots, erected at the south-west corner of Broad and now Arch streets, a brick office or counting house, one story high, sixteen feet in front and twenty feet in depth; and in 1843 they erected a six-ton platform scale on the said corner lot, and on this and the next adjoining lot the necessary shedding for storing coal, and they laid down a railroad track extending from the tracks in Broad street into and over the said three lots for the carriage of coal into their yard for the purposes of their business.

" By deed dated February 29th 1848, Messrs. Pearson & Bast became the owners in fee of the westernmost of the said three lots, and shortly afterwards erected on the rear end thereof, on Cuthbert street, a two-story brick stable.

" The said Pearson & Bast, or Pearson alone, continued to occupy the said three lots as a coal-yard, using the office, shedding, scale and stable, until about 1856, when a Mr. Baum (as lessee) carried on the business there for awhile and was succeeded by Messrs. Daniel Rothermel & Brother (as lessees), who carried on the business for about three years, and afterwards Daniel Rothermel continued the said business, using the said buildings and improvements, until about March 1869, when the church defendants took possession of the said premises.

" Whether or not Messrs. Pearson & Bast, or either of them, ever claimed to have the right to use the said premises as a coal-yard, in violation of the restriction contained in the agreement, does not appear; but Mr. Rothermel did not so claim. He says that he never knowingly used the said lots in violation of the said restriction, and that his occupation of the said premises was of a merely temporary character.

" According to the opinion of competent conveyancers, the existence of the said restriction adds to the value of the property in the said square. All of the other lots in the said square are improved in strict observance of the said restriction." * * *

" It does not appear that the agreement or the restriction contained therein was referred to or mentioned in any of the deeds of conveyance of the said three lots, but the church defendants knew before their purchase that the said lots were subject to a restriction of some sort, and very soon after the purchase received notice of the particulars thereof."

The master concluded an elaborate opinion as follows:—

" In view then of the restriction contained in the deed of January 23d 1837, the master is of opinion and so reports, that the first and second prayers of the plaintiff's bill should be granted, and that a perpetual injunction restraining the defendants as therein prayed should be awarded."

Exceptions to the report of the master were filed by the defendants. They were, after argument, dismissed by the court at

Nisi Prius (Sharswood, J.), where it was " decreed, that the said exceptions be dismissed, and that the defendants, and each of them, be perpetually enjoined from erecting a church edifice, or any other building, to be used for purposes other than as and for a private dwelling-house, office, privy or necessary house, coach-house or stable, as is provided for in a certain indenture of agreement between David Winebrenner *et al.* of the one part, and Isaac S. Lloyd *et al.* of the other part, dated January 23d 1837," &c.

The defendants appealed to the Supreme Court in banc, and assigned the decree for error.

*T. Cuyler*, for appellant.—There has been an open, visible and notorious use of the premises in a manner inconsistent with the easement claimed for a period exceeding twenty-seven years, and this has been acquiesced in by complainants or those under whom they claim, during all that time.

Such a use was inconsistent with the covenant. Whatever the letter of the covenant may be, its spirit is the exclusion of all business uses of these lots.

The spirit, true intent and meaning of the covenant is that none of the lots should be devoted to mercantile or business uses, and therefore it provides for *dwelling* as contradistinguished from *business* houses or stores. Moreover, it may fairly be said that its spirit would exclude whatever to the usual and common taste and judgment of their occupants would render less agreeable a dwelling-house as a place of residence, or diminish its value as an investment.

Wherein is it threatened with violation? A structure of great architectural beauty is intended to be erected, which will, when completed, beautify and adorn the whole neighborhood. No right-minded person could justly say that his dwelling was rendered less beautiful, or less valuable, or less peaceful and comfortable as a home, by the presence of such a church as is proposed to be erected.

III. The plaintiff, if entitled to any remedy, had adequate remedy at law, and

IV. The remedy in equity is discretionary under all the facts and circumstances of the case with the chancellor, and nothing in the circumstances of this case calls for the interposition of a court of equity: Washburne on Easements 577; King *v.* McCully, 2 Wright 76; Rhea *v.* Forsyth, 1 Id. 503; Van Beyen *v.* Van Beyen, 3 Johns. Ch. 286; Biddle *v.* Ash, 2 Ashmead 211; 2 Story's Eq., §§ 925, 926; 1 Fonblanque Eq. 3 note; Washburne on Easements 581, § 5; Ingraham *v.* Durwell, 5 Metc. 118; Dana *v.* Valentine, Id. 8.

*S. S. Hollingsworth* and *G. W. Biddle*, for appellees.—The

language of the agreement constitutes a covenant: Paschall *v.*
Passmore, 3 Harris 307; Clark *v.* Martin, 13 Wright 290, 298.
It is a covenant running with the land: Spencer's Case, 1 Smith's
L. C. 145; White *v.* Lowry, 3 Casey 257. The court will enjoin
what interferes with ordinary enjoyment of a dwelling-house:
Walter *v.* Selfe, 4 De Gex & Sm. 315; Soltau *v.* De Held, 9 E.
L. & Eq. R. 123. Equity will restrain violation of a mutual
covenant of this kind: Barratt *v.* Richards, 8 Paige 351; Biddle
*v.* Ash, 2 Ashmead 211; Commonwealth *v.* Rush *et al.*, 2 Harris
186; Clark *v.* Martin, 13 Wright 290–8. This interference is
justified, on ground of enforcing specific performance of a con-
tract: Scott *v.* Burton, 2 Ash. 325; Barret *v.* Blagrave, 5 Vesey
555; Stuyvesant *v.* Mayor of New York, 11 Paige 415; Com-
monwealth *v.* Rush, 2 Harris 196; Bonaparte *v.* C. & A. Railroad,
1 Bald. R. 205; Jarden *v.* P. W. & B. Railroad Co., 3 Wharton
512. A single breach of a continuing covenant is no defence to
an action for a subsequent breach: Doe d. Baker *v.* Jones, 5 Exch.
498; Bleecker *v.* Smith, 13 Wend. 533; Dumpor's Case and
Notes, 1 Smith's L. C. 93–99. The release of part of a continuing
covenant, does not work a release of the entire covenant: Smith
*v.* Barnes, Rolle's Abr. 472, pl. 8; Reed *v.* Norris, 2 Myl. &
Craig 361; Williams *v.* Dakin, 22 Wend. 201.

The opinion of the court was delivered, May 8th 1871, by

SHARSWOOD, J.—The affirmance of the decree below might well
be rested upon the clear and able opinion of the master.

It is not disputed that the covenant upon which the injunction
was prayed ran with the land and was binding upon the defend-
ants; nor has it been pretended that a court of equity is not bound
according to well-established principles and precedents to enforce
the specific performance of such a covenant by restraining its
breach unless some good ground can be shown to the contrary.

It has been argued but not much pressed, that the edifice pro-
posed to be erected by the defendants, if against the letter, is not
against the spirit of the covenant. It is urged that it was aimed
at preventing what might be a nuisance or annoyance to the own-
ers of other dwelling-houses on the square, and that a church in
no sense would be such. It is enough to say in answer to this
suggestion, that by confining the erection of buildings to private
dwelling-houses, offices, privies or necessary houses, coach-houses
or stables, it was evidently intended to prohibit any buildings of
public resort, such as a hotel, circus, menagerie, theatre or other
similar establishment; and if the plaintiff cannot prevent a church
from being built in the first instance, he certainly could not after-
wards prevent it from being used for any other purpose. The
covenant is directed against the building alone, not the subsequent
use, and when a building is lawfully erected on either of the lots,

so far as that building is concerned, the covenant is at an end. There would be nowhere any power to restrain its application to any purpose not a nuisance in itself. To protect himself, therefore, from such a consequence, it was the clear right of the plaintiff to stand upon the covenant, even though the erection of a church might not prove of any actual inconvenience or annoyance to him so long as it was only used as a church.

It is plain, too, that in such a case the amount of damage which the plaintiff may be likely to suffer from the threatened breach, ought not to enter as an element in the determination. In this respect there is a manifest distinction between cases depending on nuisance and on contract: Attorney-General v. The Railway Companies, Law Rep. 3 Ch. Ap. 99; Hills v. Miller, 3 Paige 254. Indeed, the fact that a jury would not give probably any more than nominal damages is a circumstance which appeals most strongly to the conscience of the chancellor to stretch forth the strong arm of the court for the plaintiff's relief. It is his only adequate remedy for the violation of a clear and indubitable right.

The main contention here, however, has been, that the plaintiff has acquiesced since 1842, in an use or enjoyment of the lots now in question adverse to the rights secured by the covenant. Without discussing a very interesting question which might be mooted as to the legal effect of an adverse enjoyment, upon a covenant running with the land as to which there is neither the bar of the Statute of Limitations nor presumption from lapse of time as held by this court in Trustees of St. Mary's Church v. Miles, 1 Whart. 229, we may concede that such an acquiescence would be an effectual answer to a prayer for equitable interference. A chancellor will not enforce the specific performance of a contract unless the plaintiff has been always vigilant. If he has slept upon his rights for a period far short of that necessary to create a bar by the Statute of Limitations, the doors of the court of equity will certainly be closed against him.

Let us see whether in 1842, or subsequently, there was any actual breach of this covenant which would have entitled the plaintiff to enter, under the clause of entry contained in the deed, or to have maintained an action or a bill for an injunction. It may be well to remark at the outset, that according to the express terms of the instrument in which the covenant is comprehended the restrictions were only to cease " whenever either of the said lots of ground shall be improved by buildings, which shall be built in accordance with the spirit of this agreement." The spirit of the agreement evidently contemplated the improvement of the ground by the erection of permanent buildings. That is the popular and ordinary sense of the word " improved." It does not refer to mere temporary structures, intended only to answer the pur-

poses of present use, however long that use might continue. We can easily understand the difference, without perhaps being able to draw an exact line. Every case must depend upon its own circumstances. There might be structures upon the lots, from which it would be difficult to say, whether they were thereby intended to be permanently improved. But certainly wooden sheds to cover coal from the weather, or platform scales for the purpose of weighing it, no one would regard as within the category. If a large and liberal interpretation according to the spirit of the agreement is to be applied to this covenant, then there never was anything done upon the lots or either of them, which was in violation of it, or could be termed an adverse one. The master was perfectly accurate in saying: "The language of the covenant plainly shows that the restriction was to apply only to the permanent buildings to be erected on the lots, whenever the owners should improve them, and until such time, the owners could use their respective lots in any way they might see fit. So long as a lot should remain unimproved, there could be no non-user of the easement, and any use of the premises other than for the erection of permanent structures could not of itself be such an inconsistent or adverse use thereof that acquiescence in it or lapse of time would defeat the right to the easement."

But it is not necessary to insist upon this construction. We may consider that the sheds and the platform scales were violations of the covenant. The office and stable surely were not. They were expressly named as permitted. The third lot from Broad street, that immediately adjoining the plaintiff's, had no structure upon it whatever but the stable upon the rear. The covenant is several—applicable to each lot separately. Practically if the plaintiff has a right to the advantage of the covenant as to the third lot, all his purpose will be answered. The defendants require all three lots for the church. The railway track which was also on the same lot with the stable was certainly in no sense a building, any more than would have been a walk or road paved with brick or cobble stones.

It is contended, however, that the covenant in permitting an office, privy or necessary-house, coach-house or stable, to be built, intended thereby only such buildings as are appurtenant to a private dwelling-house. It does not say so, and it would be to import a qualification not expressed so to hold. Certainly covenants of this nature which restrain a man in the free enjoyment of his property, are not to be extended by implication. In contending hereinbefore for a liberal construction of the covenant—it was meant liberal to the covenantor—not in the sense of imposing upon him restrictions to which he had not agreed. But be it so as contended for. *Non constat* that the stable was not built as appurtenant to a private dwelling-house to be thereafter erected

[St. Andrew's Church's Appeal.]

on that lot. There is certainly nothing in the covenant which prescribes the order in which these buildings shall be erected—that the dwelling-house shall be built first and the office and stable afterwards—nor to prevent the grantees of the land from taking their own time and mode of putting up the improvements contemplated. Suppose when the stable was first built the plaintiff had filed a bill and prayed an injunction, could not the defendant have answered: Eventually I expect to build a private dwelling-house on Arch street, to which this stable may be appurtenant, in the mean time, however, I mean to use it in connection with my business as a coal dealer. Would any chancellor have enjoined him? I must say that it seems to me very clear that he would not. The covenant is expressly limited to building; it has not a word in it about use and occupation. The moment the lot is improved in accordance with the agreement by the express terms of the instrument the restrictions cease. It is not intended for all time as a perpetual inhibition, but is expressly confined to the first improvement. In the mean time the grantees of the land, by virtue of their ownership, in that respect unrestricted, could use their property for any purpose not a nuisance *per se*—*ex. gr.*, for a pasture lot, a garden, a board-yard, a marble-yard, a coal-yard; and if for this use in any shape they should wish to have an office, privy or necessary-house, coach-house or stable, as convenient and useful, they could put them up to be applied to the use of the dwelling-house when subsequently erected. Surely the proprietor, without infringing this covenant, could have built back buildings or kitchens, to be used *in futuro* in connection with houses in front, but in the mean time to be occupied or rented out as distinct and independent tenements. Nothing is more common than that mode of improvement. The sheds and other fixtures—not buildings—which were necessary for the use of the premises as a coal-yard, and the office and stable, we think, were no infringement of the covenant, and of course that there has been no adverse use which can be set up as a bar to the plaintiff's right.

Decree affirmed and appeal dismissed at the costs of the appellant.

AGNEW and WILLIAMS, JJ., dissented.